■ In the Matter of FOREST VISTAS Co., Respondent, v ROBERT ABRAMS, as Attorney-General of the State of New York, Appellant. — Order and judgment (one paper), of the Supreme Court, New York County (Louis Grossman, J.), entered November 21, 1983, granting the application of petitioner requiring respondent to accept petitioner's offering plan for an eviction cooperative conversion of the premises involved and denying respondent's motion to dismiss the petition, unanimously reversed, on the law, without costs, and respondent's motion to dismiss the petition granted. ¶ Petitioner, a partnership, is the long-term lessee of premises in Forest Hills known as the Brooks Mews. Respondent is the Attorney-General of the State of New York. On October 29, 1982, petitioner delivered to respondent's Real Estate Financing Bureau an eviction plan for conversion of the premises to cooperative ownership. After petitioner supplied respondent with certain information requested by him pursuant to a deficiency notice, respondent notified petitioner that he could not accept the plan for filing on the ground, among others, that he was unable to make a finding that, on the date the plan was first offered for filing, an excessive number of long-term vacancies did not exist. ¶ So far as is here pertinent, section 352-eeee (subd 2, par [e]) of the General Business Law provides that the Attorney-General shall not accept an eviction plan of cooperative ownership for filing unless he "finds that an excessive number of long-term vacancies did not exist on the date that the offering statement or prospectus was first submitted to the department of law. 'Long-term vacancies' shall mean dwelling units not leased or occupied by bona fide tenants for more than five months prior to the date of such submission to the department of law.

'Excessive' shall mean a vacancy rate in excess of the greater of (i) ten percent and (ii) a percentage that is double the normal average vacancy rate for the building or group of buildings or development for two years prior to the January preceding the date the offering statement or prospectus was first submitted to the department of law". ¶ Certain facts are undisputed. The Brooks Mews development consists of 138 dwelling units. The average vacancy rate for the two-year statutory period was 3.2. Thus, the percentage "double the normal average vacancy rate" would be 6.4%. Inasmuch as 10% is the greater of the two, vacancies in excess of 13.8 dwelling units would be excessive. ¶ It is also undisputed that, at the time the plan was offered for filing, *at least* 13 dwelling units had been vacant for at least five months. The nub of the dispute concerns the manner in which these "long-term" vacancies had been achieved. *Prior* to the commencement of the five-month period the number of vacancies had been 19. *During* the five-month period, six tenants in the development had moved from the apartments occupied by them into six of these vacant apartments, reducing the number to 13. Indeed, one of the six signed his lease for the new apartment on October 27, 1982, two days before the filing. He did not move into the new apartment until November 7 or 8, and his rent did not start until November 1, 1982, three days after the filing. ¶ Special Term held this to be a compliance with the requirements of section 352-eeee (subd 2, par [e]). We disagree. ¶ The purpose of the statute was to prevent "warehousing" of apartments in order to reduce the number of subscription agreements by tenants in occupancy necessary to declare the plan effective. It was to insure that by obtaining the requisite percentage who did subscribe, the sponsor was reflecting the general will of the tenants. If, by the simple expedient of shuttling tenants from one apartment to another, the legislative purpose can be overcome, the protection which the Legislature patently intended to afford to tenants in occupancy is meaningless. ¶ Here, there were 19 apartments which had been vacant at a time at least five months prior to the filing of the plan. At the time of the filing 19 apartments were still vacant, albeit five or six of those were different apartments. To give to the statute the meaning which obviously the Legislature intended, we hold that where a tenant in occupancy transfers from one apartment to another within the five-month period, leaving the vacated apartment uninhabited, the period of vacancy in both the old and new apartments must be added together to determine whether there has been forbidden "warehousing". We conclude that the Attorney-General did not violate any duty enjoined upon him by law in refusing to accept the eviction plan for cooperative ownership. To the contrary, his ruling was rational and was neither arbitrary nor capricious. His motion to dismiss the proceeding should, therefore, have been granted. Concur — Kupferman, J. P., Sullivan, Ross, Bloom and Alexander, JJ.